Filed 1/27/14  P. v. Berumen CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL BERUMEN,<br><br>    Defendant and Appellant. | B242701<br><br>(Los Angeles County<br>Super. Ct. No. GA080041) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Janice Claire Croft, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Defendant Rafael Berumen appeals from a judgment entered after a jury convicted him of one count of murder in the first degree (Pen. Code, § 187, subd. (a)),[1] and found to be true the firearm allegations (§ 12022.53, subds. (b)-(d)). The jury did not reach a finding on the alleged special circumstance that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)).

Appellant was sentenced to a total term of 50 years to life in state prison based on a term of 25 years to life for his murder conviction and a consecutive term of 25 years to life for the section 12022.53, subdivision (d), firearm enhancement.

Appellant contends that the trial court prejudicially erred when it instructed the jury that, as a matter of law, smirking or grinning is inadequate provocation to reduce murder to manslaughter under a heat of passion theory. Although the instruction may have been erroneous, any error was not prejudicial. We affirm.

## FACTS AND PROCEEDINGS BELOW

### A. Prosecution Evidence

Appellant dated Maria Cristina Uribe Vargas ("Uribe Vargas") for approximately four years prior to December 2009. Both had children from other partners, but did not have children together. Uribe Vargas had four children of her own (two of whom were adults), and appellant had two adult children of his own. All four of Uribe Vargas's children lived with her on the second floor of a two-story apartment building. Uribe Vargas's brother, Francisco Uribe ("Francisco"), lived on the first floor in the same building. Uribe Vargas worked at Primo Foods in Monterey Park.

Uribe Vargas testified that, in mid-2009, Uribe Vargas and appellant briefly broke up when Uribe Vargas discovered that appellant was cheating on her with his coworker Rosa. They reconciled, then broke up again on December 24, 2009. In the five months after their December 2009 break up, they both tried to reconcile, but they never actually did. During this time, appellant continued to visit Uribe Vargas's home and family, with

---

[1] All subsequent statutory references are to the Penal Code.

2

her permission, because he had developed a close relationship with Uribe Vargas's children and her daughter in particular.

Sometime after December 2009 and before May 2010, appellant went to Primo Foods while Uribe Vargas was working without Uribe Vargas having invited him. Uribe Vargas was surprised to see him there and asked why he was spying on her. Appellant said it was because Uribe Vargas was being unfaithful to him. Uribe Vargas told appellant that she was not cheating on him because they were no longer in a relationship. She said that she could date someone else if she wanted.

In April 2010, Uribe Vargas met Jose Aguirre, who worked with her at Primo Foods. Uribe Vargas hosted an event at her apartment in mid-April 2010 and both appellant and Aguirre attended. Uribe Vargas was not yet dating Aguirre at that time, and she introduced him to appellant as a coworker.

In early May 2010, Uribe Vargas and Aguirre began dating. Uribe Vargas did not tell appellant about the relationship because she was fearful of how he would react.

On the evening of May 13, 2010, appellant returned from a trip to San Antonio and went to Uribe Vargas's home. Appellant brought information about apartments in San Antonio and asked Uribe Vargas to move there with him. They had never previously discussed moving to San Antonio together, and Uribe Vargas found the conversation odd. Uribe Vargas told appellant that she would not move with him and reminded him that they were no longer a couple. Uribe Vargas did not tell appellant that she was dating someone new.

Appellant asked Uribe Vargas if he could spend the night at her house because it was late and he was not feeling well enough to drive. Appellant lived 40 to 50 minutes away, so Uribe Vargas allowed him to spend the night. Appellant slept on the floor in Uribe Vargas's bedroom while Uribe Vargas slept in the bed with her daughter and son. Uribe Vargas and appellant did not engage in any romantic activity that night.

The following morning of May 14, 2010 at approximately 6:00 a.m., Uribe Vargas woke up to the sound her cell phone made when she received a text message. Before Uribe Vargas could check the message, appellant picked up her phone and looked at the

3

text message.  The message was from Aguirre and asked for a sign of life, which was a way of checking in on someone, because Uribe Vargas had not answered her phone the night before when Aguirre had called.  Upon seeing the text message, appellant started yelling at Uribe Vargas, accusing her of being unfaithful and calling her a "prostitute."  Uribe Vargas and her children became frightened.  Uribe Vargas told appellant to stop yelling and said the person who sent the text message was just a friend and coworker.  Appellant continued to angrily yell at Uribe Vargas for about 20 minutes.  Uribe Vargas's two older sons told appellant to stop insulting Uribe Vargas, but appellant refused.  At one point, appellant began pulling Uribe Vargas, and her oldest son hit appellant in the face, causing him to bleed.  Francisco, Uribe Vargas's brother, came into the apartment and appellant left with Francisco willingly.  Appellant took Uribe Vargas's cell phone with him when he left.

Francisco testified that he had been washing his car when he became aware of the altercation and went upstairs to Uribe Vargas's apartment.  Francisco did not hear what the argument was about but could hear Uribe Vargas yelling and appellant talking to her.  Appellant appeared angry and had an injury to his face.  Francisco said in a calm voice to appellant "why don't you leave" and appellant followed Francisco out of the apartment.

Francisco returned to washing his car.  While outside with Francisco, appellant called someone on the phone — Francisco did not know who he dialed — and said, "'Do you know who's talking to you?  I'm telling you take care of yourself because I'm going to kill you.'"  Appellant then hung up.  About three minutes later, appellant again made a phone call and said, "'Watch out because they're going to kill you'" and that "nobody was going to take his woman."  After each call, Francisco told appellant that what he was doing was not all right, and appellant responded that "'[n]obody is going to take my woman."  Appellant's voice was a little louder than normal during the calls and threatening, but he was not screaming.  Appellant then got into his car and drove away.

Appellant returned to Uribe Vargas's residence on foot at about 8:00 a.m.  Uribe Vargas had a blue Saturn that she purchased and used in her daily life.  The car's title and registration were in appellant's name.  They both had keys to the car.  Appellant threw

4

some of Uribe Vargas's things out of the blue Saturn, insulted her, and drove away. Appellant retuned about a half hour later in the Saturn. He sent one of Uribe Vargas's sons to see if Uribe Vargas would speak with him, and she refused. Appellant drove away again in the Saturn.

At around 10:30 a.m., Francisco saw appellant return in his car to Uribe Vargas's apartment building and asked one of Uribe Vargas's sons to see if she would speak to appellant, but Uribe Vargas refused and appellant drove away.

Gelma Velazquez, a manager at a Big 5 Sporting Goods store in Pomona, testified that, at about 10:50 a.m., appellant was at her store and she assisted appellant in purchasing shotgun shells. She informed appellant that boxes of five were on sale and appellant smirked and said in a joking manner that he only needed one shell. Appellant purchased two of the five-shell boxes. Velazquez asked appellant if he was going to use the ammunition on a small animal or a big animal; appellant smirked and replied, "Well, you could say, you know, big animal."

Patricia Silva, who was working at the reception desk of Primo Foods, testified that sometime between 10:00 and 11:30 a.m.,[2] a person resembling appellant's physical appearance came to the reception desk and asked if Aguirre was there. Silva told the man that Aguirre was not there and, when the man asked what time Aguirre would arrive at work, Silva told him she could not give out that information. Silva found the question odd because the man was not dressed like a vendor and usually a lot of vendors come in.

At about 1:30 p.m., Ivan Hernandez was driving into the parking lot next to Primo Foods, where he worked. He saw Aguirre driving toward the parking lot in the opposite direction from where Hernandez was waiting to turn left into the parking lot. A blue Saturn was tailgating Aguirre's car as it turned right into the Primo Foods parking lot. The Saturn continued to drive straight and pulled over in a red zone in front of the parking lot.

---

[2] Silva did not remember if the man came in the day of the shooting or the prior day.

Appellant exited the Saturn and walked at a "fast pace" to Aguirre's car. Another Primo Foods employee, Luis Rivera, arrived at the parking lot and saw appellant "trying to wave [Aguirre] down to stop the car." Aguirre was driving slowly and stopped when appellant reached the car. Appellant and Aguirre argued for about 20 to 30 seconds, with most of the angry words coming from appellant. Hernandez described appellant as appearing "very agitated" and had "rage in his look" during the encounter while Aguirre "looked kind of surprised."

Aguirre then continued driving his car in the parking lot, while appellant walked quickly back to the Saturn, making eye contact with Rivera, and pulled out a shotgun from the trunk. Appellant put the shotgun to the right side of his leg and started walking to the driver's side of Aguirre's car. Aguirre stopped his car again when appellant approached this second time. Appellant's left side was facing Aguirre and it appeared appellant was carrying the shotgun so as to hide it from Aguirre's view.

Appellant and Aguirre again exchanged words with Aguirre still looking surprised. Appellant took two steps back, raised the shotgun, placed the barrel through the window and inside Aguirre's car, and squeezed the trigger. Aguirre raised his left arm defensively, but the gun dry fired. After the dry fire, Hernandez ran toward appellant, hoping he could tackle him before appellant could fire a round. Hernandez made eye contact with appellant, and appellant racked a shell into the chamber and fired at Aguirre from a couple of feet away. Aguirre was struck in the arm and his "flesh splatter[ed] all over inside the car." Hernandez ran back behind his car to take cover. A few seconds later, appellant fired a second and immediately a third shot, placing the barrel on the left side of Aguirre's torso. Appellant then calmly and casually walked back to the Saturn, making eye contact with Hernandez, and put the shotgun through the driver's side window and into the passenger side of the car.[3] When appellant opened the driver's side door, appellant made eye contact with Hernandez again and "saluted"

---

[3] While appellant walked back to his car, Hernandez noted down the license plate of the Saturn.

6

Hernandez, as well as Rivera, by raising his hand up to his forehead, then flicking it forward. Appellant got into his car, made a U-turn, and drove away slowly.

Hernandez and Rivera approached Aguirre's car. Rivera called out Aguirre's name, and Aguirre looked toward him. Aguirre was having trouble breathing, then stopped breathing. He still had his seatbelt on and the engine was still running. By the time police arrived, within minutes, Aguirre was dead. All three shots were fatal.

Appellant returned to Uribe Vargas's residence around 1:40 or 2:00 p.m. Appellant went to Uribe Vargas's apartment and knocked on the door. Uribe Vargas answered. Uribe Vargas described appellant as appearing "tranquil." He told Uribe Vargas, "I already did it." Uribe Vargas asked what he had done, and appellant replied, "I killed him." Uribe Vargas asked appellant what he was talking about, and appellant said, "I shot him three times." Appellant told Uribe Vargas that he had shot "your Jose." Appellant gave Uribe Vargas the car keys and her cell phone, but told her not go to the car because there were weapons inside, and said that he was going to surrender himself.

Francisco was outside when he saw appellant walking up to the apartment building and appellant showed Francisco a "rifle" in the blue Saturn. When appellant showed Francisco the shotgun, he told Francisco, "I already did it," "So what" and placed the shotgun back into the trunk of the car. He seemed calm.

Police arrived at Uribe Vargas's building while appellant was showing Francisco the shotgun. Appellant initially did not comply with officers' directions to put his hands up, instead pulling a handgun from his waistband and telling police to shoot him because he did not want to go to jail. Appellant ultimately placed his gun on the ground and was arrested.

Three shotgun shells were found in the Primo Foods parking lot. Each shotgun shell held nine pellets and each pellet was bigger than the type of bullet loaded in appellant's handgun and would have been fired from the shotgun with more velocity than bullets would have from the handgun; thus, a single fire from the shotgun was capable of causing much more damage than a single fire from the handgun.

7

**B. Defense Evidence**

Tess Alexia Nicole Cardenas had known appellant for about three years prior to May 2010. Cardenas and appellant worked together at Walgreens, as well as socializing outside of work. Cardenas had never known appellant to be violent and believed he was kind, helpful, and generous.

On January 31, 2011, Silva (the Primo Foods receptionist) was shown a photographic lineup including a photograph of appellant but she was unable to identify the person who visited Primo Foods and asked for Aguirre, stating that another person in the lineup resembled the person who asked for Aguirre but that it had been so long she could not remember.

Appellant testified in his defense as follows: Appellant ran a security service for about 25 years and because of this owned numerous guns. Appellant knew that a shotgun would cause more damage than a handgun.

Prior to May 2010, appellant and Uribe Vargas dated for about four years, the first three and half years of which were "nothing but honeymoon." They saw or spoke to each other every day, and appellant took an active role in Uribe Vargas's children's lives. Possibly in June 2009, Uribe Vargas misinterpreted a text message appellant received from a coworker named Rosa but appellant had not cheated on Uribe Vargas with Rosa. After appellant and Uribe Vargas had been together for about three and a half years, they began having arguments about money, including an argument on Christmas Eve 2009 but did not break up. According to appellant, Uribe Vargas gave appellant a ride home, they had intercourse, and the relationship continued.

In February 2010, appellant purchased the blue Saturn for Uribe Vargas after previously purchasing a white car for her, but that car had recurring mechanical problems. At the end of February and beginning of March 2010, appellant had surgery and Uribe Vargas took appellant to the hospital, visited him there, and allowed him to stay in her home for over two weeks after his discharge. During that time, appellant and Uribe Vargas argued about Uribe Vargas's children and appellant left Uribe Vargas's home, at her request, around April 10. According to appellant, he continued to visit

Uribe Vargas and stay at her house for days at a time the two of them never broke up and never agreed to date other people.

On April 24, 2010, appellant helped Uribe Vargas set up her home to host an event where appellant met Aguirre. Aguirre appeared to be trying to impress someone, and he and Uribe Vargas kept looking at each other. Appellant became suspicious that something was going on between Aguirre and Uribe Vargas. After Aguirre left, when appellant asked about him, Uribe Vargas said he was just her coworker; appellant asked if Aguirre was the coworker who had tried to date Uribe Vargas, and she said he was. About a week later, after appellant and Uribe Vargas had intercourse, appellant asked if Aguirre had asked Uribe Vargas out again and she said he had not.

On May 7, 2010, after staying at Uribe Vargas's house for three days, appellant drove to San Antonio to visit his sister. They never discussed breaking up. The day before he left, he visited Uribe Vargas at Primo Foods during her lunch and afternoon breaks, said goodbye and left flowers for Uribe Vargas in her car. While in San Antonio, appellant spoke with Uribe Vargas on the phone every day.

Appellant returned from San Antonio the evening of May 13, 2010 and called Uribe Vargas, who was expecting him, when he was about an hour from her house. He arrived at Uribe Vargas's house around 6:00 p.m. and they had dinner. He brought his dirty laundry and gifts for the children, intending to spend the night at Uribe Vargas's house. Appellant told Uribe Vargas that he had looked at apartments and job opportunities in San Antonio and that he wanted her to move there with him. Uribe Vargas said it seemed like a good idea, but she wanted to separate from appellant for 10 to 15 days to see if she really loved him. Appellant was surprised, but he agreed to a temporary separation on the condition that he and Uribe Vargas would not date other people during the separation. Uribe Vargas told appellant that she had not been dating anyone else yet, and she would not date anyone else during the separation. After this agreement, appellant and Uribe Vargas discussed taking Uribe Vargas's children to San Antonio for a vacation over the summer. They also kissed and hugged.

9

Appellant spent that night in bed with Uribe Vargas and began getting physically intimate before hearing Uribe Vargas's son wakeup, and then just kissed and hugged instead. At about 6:00 a.m. the next morning, appellant heard Uribe Vargas's cell phone ringing, but Uribe Vargas did not wake up so appellant retrieved her phone and saw the text message from Aguirre. Due to the personal nature of Aguirre's message and the early morning hour, appellant became suspicious and woke up Uribe Vargas and asked if she was cheating on him. Uribe Vargas said Aguirre was just a coworker and she was not cheating on appellant, but appellant could tell she was lying. Appellant stated that he was really angry, but he did not say anything insulting to Uribe Vargas. Appellant began walking around the house, picking up his belongings, while arguing with Uribe Vargas. He did not tell Uribe Vargas that he was going to kill Aguirre, only saying to her, "You betrayed me. You've been cheating on me." Appellant told Uribe Vargas's son that he was leaving, the son would have to start being the man of the house, and Uribe Vargas was physically ill and should be hospitalized, angering Uribe Vargas. Her son struck appellant. Uribe Vargas repeatedly yelled at appellant to leave and Francisco came into the house and also told appellant to leave. Appellant gathered the rest of his belongings and left with Francisco.

Once he was outside, appellant called Aguirre on Uribe Vargas's phone. Appellant asked Aguirre if he knew who he was, Aguirre said he did, and appellant told Aguirre he was going to kill him. Appellant testified that he did not actually intend to kill Aguirre and made the statement because he was "very upset." Appellant put his belongings into the car, then called Aguirre again because he was so upset that Uribe Vargas had cheated on him. Appellant again asked if Aguirre knew who he was and repeated that he was going to kill Aguirre. After this second phone call, Francisco offered appellant some water to wash the blood from his face, and appellant washed his face and entered the white car, intending to find Aguirre. Appellant stated that he did not intend to kill Aguirre; he just wanted to talk to him.

Appellant drove to Primo Foods hoping Aguirre would be there, but after asking a man in the parking lot if Aguirre was there, was told Aguirre was not. As appellant drove

10

away, the car broke down so he walked back to Uribe Vargas's house. He ran into Uribe Vargas leaving and asked to talk to her. Uribe Vargas said she would talk to appellant after she took her daughter to school. When Uribe Vargas returned, appellant asked her about Aguirre again. Uribe Vargas again denied that anything was going on with Aguirre, but appellant could tell she was lying.

Appellant then drove the blue Saturn to the white car to make sure he had locked it and to transfer his belongings to the Saturn. He did not go back to Primo Foods and ask for Aguirre and never spoke with Silva. Instead, he drove to Big 5 Sporting Goods in Pomona, which was on the way to his home, to purchase shotgun shells to go to a shooting range to distract himself from Uribe Vargas's betrayal. Appellant's only conversation with Velazquez was about the prices of different boxes of shells and he did not tell Velazquez that he was going to hunt a big animal or joke with her about only needing one shotgun shell. Appellant left the store and drove to his house, loaded the shotgun and packed it and a handgun into the car because he was going to use both at the shooting range.

As appellant drove toward the shooting range, he could not stop thinking about Uribe Vargas cheating on him, so he got on the freeway and headed back to Los Angeles to speak with Aguirre. Appellant wanted to know how serious Uribe Vargas and Aguirre's relationship was and whether appellant would have a chance to repair his relationship with Uribe Vargas. He drove to Los Angeles to speak with Aguirre even though he knew Aguirre would not be working for a few hours and did not call Aguirre because he did not think to do so or because he believed it would be too easy for Aguirre to lie over the phone. Appellant stated he was very upset and had forgotten about the guns in the trunk of the car.

Appellant drove by the Primo Foods parking lot, seeing that Aguirre's car was not there, and returned to his white car, which was parked three or four blocks from Primo Foods, but still was unable to start it. He intended to return to Uribe Vargas's house and talk with her again, hoping she would have calmed down and would tell him the truth.

11

As appellant returned to the Saturn, he saw Aguirre drive by. Appellant followed Aguirre to the Primo Foods parking lot and parked in front of the lot.

Appellant walked into the parking lot toward Aguirre's car and Aguirre got out of his car and walked toward appellant. Aguirre was grinning. Appellant "lost it" and became very upset. A "brown dark circle" suddenly appeared over Aguirre's face. The circle was the result of a disorder appellant suffered related to his diabetes.

Appellant was too upset to say anything to Aguirre. He went back to his car to leave, when he saw the trunk and remembered the guns and thought "You're not going to take my family away from me." Appellant opened the trunk, took out the shotgun and, without thinking of the consequences, walked toward Aguirre's car and fired the first shot. He fired because Aguirre was going to take away his family and because appellant "wasn't thinking." Appellant was going to shoot Aguirre a fourth time, but he heard a voice ask him what he was doing and looked to the right and saw someone hiding between some cars. Appellant began walking away toward his car and started realizing what he had done and thinking over and over "what have I done?" He did not wave at or salute the witnesses in the parking lot. As he realized what he had done, he wanted to die because it was the biggest mistake of his life.

Appellant got into the car and put the shotgun in the front seat and drove to Uribe Vargas's house. He told Uribe Vargas that he was going to allow the police to kill him because he did not want to go to jail. Appellant walked down the street and sat on a bench, wondering how he had done what he did and felt like he was in a trance. Appellant walked back to the Saturn and took the handgun out of the trunk, planning to walk away with the gun. He heard an officer tell him to step away from the car and walked toward the middle of the street with the gun. He believed one of the officers would shoot him. Appellant did not remember dropping the gun, only someone holding him on the ground before he passed out and awoke in a patrol car.

## C. Conviction and Sentence

The jury convicted appellant of first degree murder (§ 187, subd. (a)), finding to be true the firearm allegations (§ 12022.53, subds. (b)-(d)). The jury was unable to reach

12

a decision on the alleged special circumstance that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)).

Appellant was sentenced to a total term of 50 years to life in state prison based on a term of 25 years to life for his murder conviction and a consecutive term of 25 years to life for the section 12022.53, subdivision (d), firearm enhancement.

## DISCUSSION

Appellant contends on appeal that the trial court committed prejudicial error when it gave an instruction that, as a matter of law, smirking or grinning is inadequate provocation for purposes of heat of passion theory. Appellant contends this error violated his federal constitutional rights. While we agree that the instruction was in error, we do not find it to be prejudicial. Accordingly, we affirm.

### A. The Instruction on Provocation

During a discussion on jury instructions after both parties had rested, the trial court raised CALCRIM No. 570, the instruction on voluntary manslaughter. The following discussion then occurred:

"[PROSECUTOR]: Your Honor, I wanted to discuss that in light of the testimony that we've heard.

"THE COURT: Sure.

"[PROSECUTOR]: Based on [appellant's] testimony, it appears that he testifies that he wasn't provoked as a result of the text because he says, look, I just want -- although I made these phone calls, he says he didn't really mean he wasn't [*sic*] going to kill Jose Aguirre. He's not acting rationally is what he tells the court.

"He says he went to go look for Jose Aguirre just to talk to him, not to attack him. Not only once in the morning but that was his purpose in the afternoon. And, really, he says that when he decided that he wanted to kill Jose Aguirre was when Jose Aguirre was standing face-to-face with him and grinned.

"And if the court looks at the -- I think it's -- let me have a moment here to flip through that. I think it says in the bench notes there's case law that says grinning is not

13

enough of a provocation. In the bench notes it reads in the following cases: "Provocation has been found inadequate as a matter of law. Evidence of name-calling, smirking, or staring or looking stonefaced," People vs. Lucas, 1997, 55 Cal.App.4th 739.

"And, certainly, [appellant] testified that that moment when he decided he wanted to kill Jose was when Jose Aguirre grinned at him. And so based on the case law, that would not be sufficient provocation to elicit heat of passion.

"So I would submit to the court."

The trial court asked defense counsel for input and defense counsel responded, "Submitted, you honor." The court then stated that it seemed that appellant had "testified to about being very upset" and defense counsel agreed, saying "Right. That's the issue." The court then explained:

"THE COURT: He says -- he said from -- he talked to [Aguirre]. He says I'm going to kill you. I was really mad. I really wasn't going to kill him. I called him a second time. I just couldn't take it. I was really upset. I went to look for him. He talked some more. I wanted to go shoot him because I was really upset.

"Somehow shooting helps him get over his being upset. I wanted to find out how long this affair was going on. I was very upset. He does say he had a grin on his face. I was really upset. I remember I had a shotgun. I walked to the car. I couldn't see his face. I wasn't thinking. I heard a voice. What are you doing? I'm sure that was somebody shouting at him.

"It just seems that he was -- whether or not a jury finds that it was sufficient conduct to rise to the level of voluntary manslaughter, I believed [*sic*] that he's raised enough. I believe it would be error not to give it."

The prosecutor then asked the court to give a pinpoint instruction basically stating smirking or grinning is not sufficient provocation and the court said it would do so if the prosecutor drafted such an instruction. Later in the jury instruction discussions, the court states to the prosecutor it was "going to give that extra one about smirking, whatever the phrase you had," and the court will "put that under provocation, the definition."

14

Later that day, the trial court instructed the jury on voluntary manslaughter based on heat of passion using CALCRIM No. 570 with a pinpoint instruction drafted by the prosecutor added (and indicated by italics):

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. *As a matter of law, smirking or grinning is inadequate provocation for purpose of heat of passion.*"

## B. Analysis

On appeal, we apply a de novo standard of review for claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

The Penal Code defines murder as "the unlawful killing of a human being . . . with malice aforethought." (§ 187.) As relevant here, murder is in the first degree if the killing was willful, deliberate and premeditated. (§ 189.) Otherwise, it is in the second degree. (§ 189.) Manslaughter is defined as "the unlawful killing of a human being without malice." (§ 192.) Although generally the intent to unlawfully kill constitutes malice, malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation. (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154; *Manriquez, supra*, 37 Cal.4th at pp. 583-584; see § 192, subd. (a).)

The heat of passion requirement for manslaughter has both an objective and subjective component. (*Manriquez, supra*, 37 Cal.4th at p. 584; *People v. Wickersham*, (1982) 32 Cal.3d 307, 326-327.) "The defendant must actually, subjectively, kill under the heat of passion." Plus, objectively, """"this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.""" (*Manriquez, supra*, 37 Cal.4th at p. 584.)

As the Supreme Court has explained, "'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of

passion" form of voluntary manslaughter from murder is provocation.'" (*Manriquez*, *supra*, 37 Cal.4th at p. 583.) Moreover, as the Supreme Court has repeatedly stated, the provocative conduct may be physical or verbal; no specific type of provocation is required. (*People v. Valentine* (1946) 28 Cal.2d 121, 140 [resolving a split in authority as to whether words of abuse, insult or reproach are of themselves sufficient to incite the heat of passion by concluding it is a question of fact for the jury to decide]; *Manriquez*, *supra*, 37 Cal.4th at pp. 583-584; *Breverman*, *supra*, 19 Cal.4th at p. 163; *Wickersham*, *supra,* 32 Cal.3d at p. 326.) In certain circumstances, insults may be sufficient provocation under section 192 and "the question is whether they would, either alone or combined with other provocative circumstances, arouse a heat of passion in a reasonable person." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 236, p. 1081.) Nonetheless, the use of words commonly employed to taunt another, however grievous, does not ordinarily drive a reasonable person to such passion as would reduce an unlawful killing to manslaughter. (*Ibid.*) Thus, courts have held that gestures and words under the circumstances of a particular case are not, as a matter of law, adequate provocation to support giving a heat of passion instruction. (See, e.g., *Manriquez*, *supra*, 37 Cal.4th at p. 586; *Lucas*, *supra*, 55 Cal.App.4th at p. 739.)

Here, the pinpoint instruction stated that, "[a]s a matter of law, smirking or grinning is inadequate provocation for purpose of heat of passion." The Attorney General argues that this instruction is correct because "[g]rinning or smirking *alone* is necessarily insufficient provocative conduct" and although the trial court did not explicitly state that it was grinning or smirking alone that was insufficient, "that is the only way the jury could have interpreted the pinpoint instruction." The given instruction, however, did not inform the jury that grinning or smirking "alone" or "by itself" was

16

insufficient as a matter of law; rather it stated without qualification that "[a]s a matter of law, smirking or grinning is inadequate provocation for purpose of heat of passion."[4]

However, even if the pinpoint instruction was in error, defendant suffered no prejudice.  Under *People v. Watson* (1956) 46 Cal.2d 818, the verdict must be upheld unless it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.  (*Id.* at p. 836.)  By finding the appellant guilty of first degree murder rather than second degree murder, the jury necessarily found beyond a reasonable doubt all the elements of first degree murder, including that appellant's killing of Aguirre was deliberate and premeditated.[5]  "This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . ."  (*People v. Wharton* (1991) 53 Cal.3d 522, 572; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)  Accordingly, it is not reasonably probable that appellant would have obtained a more favorable outcome had the pinpoint instruction not been given and, therefore, appellant was not prejudiced by the instruction.  For the same reason, to extent appellant raises federal constitutional claims, we conclude that any error did not violate appellant's rights.

---

[4] The Attorney General also argues that because appellant stated that it was the grin that made him "lose it" and shoot Aguirre and also stated that he had no intention to kill Aguirre after seeing the texts and learning of the affair, that there was no other provocations.  While the grin may have been the trigger or final provocative event, other provocative events may have set the stage for its effect.  (See *People v. Le* (2007) 158 Cal.App.4th 516, 529 [whether wife's words were "the spark that caused this powder keg of accumulated provocation to explode"].)

[5] There is no claim that the evidence of first degree murder was insufficient or that the jury instructions on first degree murder were incorrect.

17

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.